1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF WYOMING

3      _____

4
       UNITED STATES OF AMERICA,            DOCKET NO. 15-CR-057-F
5
             Plaintiff,
6
             vs.
7                                           Cheyenne, Wyoming
       ANDREW LAMBERT SILICANI,             July 9, 2015
8                                           8:41 a.m.
             Defendant.
9

10     _____

11                    TRANSCRIPT OF HEARING PROCEEDINGS
                                  SENTENCING
12
               BEFORE THE HONORABLE NANCY D. FREUDENTHAL
13                  CHIEF UNITED STATES DISTRICT JUDGE

14     APPEARANCES:
       For the Plaintiff:        THOMAS A. SZOTT
15                               Assistant United States Attorney
                                 DISTRICT OF WYOMING
16                               2120 Capitol Avenue, Suite 4000
                                 P.O. Box 668
17                               Cheyenne, WY 82003-0668

18     For the Defendant:        JAMES H. BARRETT
                                 Assistant Federal Public Defender
19                               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                                 214 West Lincolnway, Suite 31-A
20                               Cheyenne, WY 82001

21     Court Reporter:           JANET DAVIS
                                 Registered Diplomate Reporter
22                               Federal Certified Realtime Reporter
                                 Federal Official Court Reporter
23                               2120 Capitol Avenue, Room 2226
                                 Cheyenne, WY  82001
24                               (307)635-3884/jbd.davis@gmail.com

25     Proceedings recorded by digital stenography; transcript
       produced with computer-aided transcription.

1                              I N D E X

2
    OBJECTIONS TO PRESENTENCE REPORT                        PAGE
3
        Mr. Barrett                                          4
4       Mr. Szott                                            4

5

6   JUDGMENT AND SENTENCE                                   PAGE

7   Mr. Barrett                                              8
    Mr. Szott                                               10
8   Mr. Barrett                                             13
    Ms. Cheryl Lambert                                      21
9   Mr. Ott                                                 24
    The Defendant                                           24
10  The Court                                               27

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DOCKET NO. 15-CR-057-F                    SENTENCING

1        (Proceedings commenced 8:41 a.m., July 9, 2015.)

2            COURTROOM DEPUTY:  In criminal matter Case

3    No. 15-CR-57-1-F, United States of America versus Andrew

4    Lambert Silicani, set today for sentencing.

5        Counsel, please state your appearances.

6            MR. SZOTT:  Thomas Szott for the United States.

7            And I would note, Your Honor, that it appears that

8    Mr. Barrett is not yet here.

9            THE COURT:  I thought everyone was here -- he was

10   here.  So we will just take a minute until Mr. Barrett arrives.

11   Thank you.

12       (Pause.)

13           MR. SZOTT:  Your Honor, I have been informed by

14   Mr. Anderson that Mr. Barrett is about five minutes out.  He's

15   on his way over.

16           THE COURT:  All right.  Thank you.

17       (Pause.)

18           THE COURT:  I think we will recess until I'm advised

19   that Mr. Barrett is here.  It shouldn't be very long.  I just

20   have a record in there that I can be reviewing, and then we

21   will reconvene as soon as defense counsel is here.  We will

22   recess until probably about 9:20.

23       (Proceedings recessed 9:09 a.m., July 9, 2015.)

24       (Proceedings reconvened 9:19 a.m., July 9, 2015.)

25           THE COURT:  We are here today for sentencing for -- in

1    Docket 15-CR-57, United States of America versus Andrew Lambert

2    Silicani.  Counsel is present as is Mr. Silicani.

3            Mr. Barrett, have you had an opportunity to read and

4    discuss with your client the Presentence Report as it was

5    revised, filed in this case?

6            MR. BARRETT:  We have, Your Honor.

7            And I do want to apologize for being late, Your Honor,

8    on the record.  I had this hearing for 10:30 instead of the

9    earlier time.

10           THE COURT:  That's fine.  I know I move hearings

11   around, and so I'm sorry if my scheduling or rescheduling

12   caused confusion on your end.

13           Are there any factual issues concerning the report?

14           MR. BARRETT:  No, Your Honor.  Of course we had

15   reserved the right to address the recommendations made by

16   Probation and the argument that will be made by Mr. Szott.

17           THE COURT:  All right.  Other than issues relating to

18   departure or variance, are there legal issues or legal

19   objections relevant to the report?

20           MR. BARRETT:  No, Your Honor.

21           THE COURT:  Thank you.

22           For Government, any factual issues or legal

23   objections?

24           MR. SZOTT:  No, Your Honor.

25           THE COURT:  All right.  I'll accept the Presentence

1   Report as the Court's findings of fact and put the following

2   guideline calculations on the record.

3           We're here for a multi-count indictment.  The various

4   counts group in different ways.  The first group includes the

5   use of interstate commerce facilities in the commission of

6   murder for hire which are included in Counts 1 and 2.  That

7   begins at a base offense level of 37 for that group.

8           The second group deals with use of interstate commerce

9   facilities in the commission of murder for hire.  Those counts

10  are Counts 3 and 4.  Those counts group under group 2.  That

11  also begins at a base offense level of 37.

12          So we have two groups.  Those groups result in an

13  enhancement for the number of units.  Each group comprises one

14  unit each, and so there are a total of two units.  That

15  elevates the defendant's offense level from a 37 to a 39.

16          He does receive a two-level reduction for his timely

17  acceptance of responsibility and a one-level reduction for his

18  assistance in the investigation and prosecution of his conduct,

19  resulting in a total offense level of 36.

20          In terms of countable criminal history points, the

21  defendant has several countable convictions.  The first is a

22  2009 conviction at age 17 which is a petty theft conviction out

23  of California.  That accrues one point.

24          He has a conspiracy to commit robbery and robbery with

25  bodily injury conviction out of Laramie County District Court

1    in 2011 at age 19.  That conviction accrues three points.

2         With a criminal history score of 4, he is further

3    enhanced because he committed this offense while under a

4    criminal justice sentence.  More specifically, while he was in

5    prison for the robbery offense, the felony offense that has

6    three countable points, so he has two points added to his score

7    of 4.  With a criminal history score of 6, he's placed in

8    Criminal History Category III.

9         At offense level 36, Criminal History Category III,

10   the guideline range is 235 to 293 months.

11        We do, as noted by Mr. Barrett, have a recommendation

12   for upward variance to reflect the seriousness of the

13   defendant's action as well as his history and characteristics.

14        We also have a sentencing memorandum from the

15   Government requesting a sentence consistent with the statutory

16   maximum which would be a 40-year sentence because he's charged

17   with four counts and each count carries a zero to 10-year

18   statutory sentence, and so for four counts, the statutory

19   maximum is zero -- the statutory range is zero to 40 years and

20   the Government requests in its sentencing memorandum a sentence

21   at the statutory maximum.

22        With that recitation of the guidelines and the

23   variance issues that are on the table, are there any objections

24   to the Court's recitation of the guidelines as they stand now?

25   And, again, we're not addressing yet the request for departure

1    or variance.

2              Anything from you, Mr. Barrett?

3              MR. BARRETT:  No, Your Honor.

4              THE COURT:  Anything from you, Mr. Szott?

5              MR. SZOTT:  No, Your Honor.

6              THE COURT:  All right.  Let's -- I do know that we

7    have -- or I have been advised from the victim coordinator for

8    the U.S. Attorney's Office that there are -- that there are

9    victims present.  Perhaps we will get on the record a statement

10   from the U.S. Attorney's Office concerning its efforts on

11   victim notification.

12             Mr. Szott.

13             MR. SZOTT:  Thank you, Your Honor.  As the Court

14   noted, there are two intended victims of this offense who are

15   victims under the law, and they are both present in court

16   today.  Additionally, the defendant's father was also notified,

17   and I would note that he has submitted a letter which was

18   attached as a supporting document to the original Presentence

19   Report.

20             So the two victims of the offense have been notified

21   and are present today and the defendant's father was also

22   apprised of the progress of the case and has submitted a letter

23   to the Court.

24             THE COURT:  All right.  Thank you.  Yes, we do have a

25   letter from James Silicani attached to the Presentence Report

1    discussing Andrew Silicani's history and his sadness in terms

2    of having to write this letter, his sense of lost hope, his

3    efforts to reach out -- although he notes that it has been four

4    years since Andrew has lived with him, his efforts to reach out

5    during time in custody.  His statement is that he cannot

6    continue to have a relationship with his son.  It's difficult

7    for him to come to this conclusion, maybe his feelings might

8    change over the time, but he -- that's the conclusion he's

9    reached, given the actions and intended actions Andrew Silicani

10   took.

11          Perhaps we'll hear statements on sentencing and then

12   I'll see if any of the victims present wish to make a

13   statement.  I'll then allow Mr. Barrett to make his last

14   statement.  Following all of those arguments and statements,

15   and then I'll call on Mr. Silicani if he has anything to say.

16          Mr. Barrett, let's start with you in terms of your

17   statement or argument on disposition.

18          MR. BARRETT:  Thank you, Your Honor.  If it please the

19   Court and Counsel, Your Honor, my position is relatively

20   simple, and I would like to reserve the opportunity, of course,

21   to respond to any argument the Government makes.

22          This is an unusual circumstance in -- with regard to

23   sentence in that I have no objection to a sentence within and

24   at the lower end of the guideline range as computed in this

25   matter, which I believe is sufficient for every purpose stated

1   pursuant to 18 USC 3553(a) and (a)(2).  It meets all the

2   criteria.  It solves all the issues.  It addresses most of the

3   problems which I would address later.

4          Nevertheless, I view the Government's position as

5   overreaching, as being excessive, given the circumstances,

6   being excessive even given the history and characteristics of

7   this defendant.

8          In saying that, I recognize that Probation takes a

9   similar position.  I worked with the Government and I worked

10  with probation a lot in this particular case.  I don't just

11  disagree, I disagree very much.  I believe what their

12  recommendations involve are primarily an emotional rather than

13  a rational reaction and consideration of the conditions set

14  forth under the statute, that it addresses one issue and one

15  issue only and that's a personal -- it can't help but be

16  personal if you're making that recommendation -- personal view

17  of the dangerousness of this defendant and overreaction to

18  protection of the public.

19         So the bottom line is my position is I think the

20  guideline represents an adequate disposition in this matter.  I

21  would -- will, of course, be arguing for a sentence toward the

22  end of that guideline.  I believe a sentence of 240 months is

23  appropriate in this case.

24         THE COURT:  Thank you.

25         For the Government.

1          MR. SZOTT:  Thank you, Your Honor.  May it please the

2    Court, Counsel.  I don't have a whole lot to respond to, of

3    course, Your Honor, since most of Mr. Barrett's arguments

4    haven't been made yet.  But to the extent that he's stated his

5    position, I guess I will respond to what he did say.

6          Let me say at the outset, Your Honor, most of the

7    Government's position is set forth in the sentencing memorandum

8    and I won't rehash all of that here.  I know the Court has had

9    an opportunity to review that.

10          This is an unusual case.  It's, needless to say, an

11    extremely serious case.  It is also a case, Your Honor, in

12    which the consequences of what Mr. Silicani intended to do are

13    and I anticipate will be extremely clear to the Court and to

14    everyone because the man and woman that Mr. Silicani intended

15    to kill, the voices he intended to silence forever, fortunately

16    have not been silenced and are here in court and I anticipate

17    will stand before the Court and really emphasize just the

18    horrible -- and how horrible it is to try to end the life of

19    another human being.

20          And again, I recognize that the Court and all the

21    parties are aware of how serious the case is, so I won't

22    belabor the point, but it bears mentioning that this is a

23    unique case in which a murder was intended, attempted,

24    fortunately thwarted, and the consequences of that and just the

25    sheer -- the value of human life will be present in court

DOCKET NO. 15-CR-057-F          ARGUMENT - SZOTT

1    today.

2          With respect to the defense argument that the

3    Government's position is excessive and is based upon an

4    emotional as opposed to a rational response, in response to

5    that argument, again, Judge, I would refer the Court to not my

6    prediction as to the defendant's proclivity for violence,

7    propensity for violence but what his own history has

8    demonstrated.

9          We're dealing here with a young man, admittedly, but

10   who has shown by his actions that he is a threat to inflict

11   deadly violence on literally anyone he comes into contact with.

12   His 2011 conviction -- convictions stemmed from a strange,

13   unprovoked, random attack on a previously unknown individual

14   that could have resulted in that person's death.  And indeed,

15   Mr. Silicani himself admitted he thought he killed this person,

16   a person with whom he had had no prior relationship and for

17   which the only apparent reason was that he had decided to rob

18   someone and apparently decided that he was also going to

19   inflict serious bodily injury and perhaps death on that person.

20         And then in the present case, we have intended victims

21   who were close to him, including his mother, someone who had

22   loved and supported him throughout his life, was continuing to

23   support him and planning to be a part of his life even at the

24   same time he was planning to put an end to hers.

25         So what we have here is a demonstrated willingness,

1    even eagerness to engage in acts of senseless, unprovoked

2    violence.

3          Now, in terms of predicting, then, the dangerousness

4    that Mr. Silicani poses in the future, his history and that

5    attack on a random, previously unknown person is very

6    significant because it suggests that although his motive for

7    killing his mother and stepfather, which was financial --

8    although that motive may no longer exist, the mere fact that

9    that motive no longer exists does not mean that he is not still

10   a deadly danger moving forward, both to people in his family

11   and to potentially unknown, unsuspecting members of the public.

12         This is not an emotional response, Your Honor.  This

13   is a response that's based on an analysis of the information

14   that we have before us.  It would be -- to ignore his history

15   of violence, to ignore the nature of the threat he poses, to

16   ignore the fact that apparently he has been unable to change

17   his ways, unable to rehabilitate himself -- that would be

18   irrational, Your Honor.

19         The reasonable thing here is to look at the facts and

20   circumstances that are before the Court.  And those facts, Your

21   Honor, simply suggest and strongly suggest, in fact demonstrate

22   that we're dealing with a young man who is a very grave danger,

23   not just to his family but to -- to unsuspecting members of the

24   public.

25         Again, Your Honor, the most -- most of the

1    Government's reasoning for this is set forth in the sentencing

2    memorandum so I won't go through all the factors in detail, but

3    as a whole, the factors under 3553(a) justify not only a very

4    serious sentence, but, indeed, a sentence at the statutory

5    maximum.

6          Again, as I stated in the memorandum, the United

7    States appreciates the gravity of standing before the Court and

8    asking the Court to sentence a young man to 40 years in prison.

9    It is a tragedy on many levels, Your Honor.  But there are

10   cases, this being one of them, where the only option left in

11   terms of protecting specific people, protecting the public, and

12   also reflecting the seriousness of the offense, the nature of

13   the conduct, is to incapacitate the defendant for as long as

14   possible.  This is that case, Judge.  And that's why the

15   Government's position is that in view of all the factors under

16   3553(a), but especially the need to protect the public and

17   prevent the defendant from committing further acts of senseless

18   violence that could easily take an innocent life, that a

19   statutory maximum sentence is justified and is necessary in

20   this case.

21         And that's our position, Your Honor.  Thank you.

22         THE COURT:  Thank you.

23         MR. BARRETT:  If I may, Your Honor.

24         THE COURT:  Counsel.

25         MR. BARRETT:  Like I said, overreaching, focused,

1    angry, emotional.  Great argument, good for television.  And on

2    TV it might even work.  But what he's saying -- what the

3    Government says is because of one event in Mr. Silicani's life,

4    let's focus on that.  The assault that Mr. Silicani admitted

5    to, let's focus on calling that the danger because there's

6    another event that's stated in the memorandum that Mr. Silicani

7    admitted to without being charged.  Now they say, oh, they've

8    got two of them.  These were unprovoked and are basically

9    random if for some reason this Court and other courts never see

10   unprovoked and random crimes and that somewhere out there in

11   the world of legalism there is a rule that says unprovoked,

12   random crimes deserve statutory maximum sentences at a later

13   date.

14        No such thing.  What the Government's argument talks

15   about, and Mr. Szott said it, Mr. Silicani's failure to

16   rehabilitate himself -- what an interesting concept -- a

17   criminal's or a charged offender's failure to rehabilitate

18   himself justifies excessive punishment.

19        That's everybody.  Everybody that stands before this

20   Court has failed in one way or another to rehabilitate

21   themselves, to make good judgments, to make good choices, so

22   they all deserve maximum statutory penalties.  That's just

23   wrong, pure and simple.

24        The Government's argument also in focusing on these

25   particular or current events ignore Mr. Silicani's background.

1   Since age 4 he's had admittedly difficult issues, mental health

2   issues.  Age 7 he's committed.  His parents recognized the

3   problems he has.  I don't use this as an excuse for what's

4   happened in this case, but you can't ignore it.  Was Mr.

5   Silicani supposed to rehabilitate himself at age 4 and age 7?

6   Was he supposed to rehabilitate himself when, as part of his

7   offender characteristics, at some point he had an IQ that even

8   his parents admit was a very high IQ that somehow in middle

9   school dropped as much as 50 points?

10          Everybody refers to these things, and nobody does

11   anything about it.  Everybody diagnoses Drew Silicani.  Nobody

12   does anything about it.

13          Now, I may be overstating that, and perhaps the

14   victims in this case can correct me and I'm sure they will.

15   I'm sure they did everything they could to try and figure out

16   what was going on with Mr. Silicani.  I don't have any question

17   they did the best they could.

18          But whatever was going on wasn't dealt with and wasn't

19   dealt with successfully.  And how does a 4-year-old, 7-year-old

20   in middle school later on rehabilitate himself?  Perhaps he was

21   given counseling.  Perhaps he was given the opportunity and

22   that didn't take which would be interpreted as being ignored,

23   but we don't know that either.

24          But it is a characteristic we can't ignore.  It is a

25   characteristic, I suppose, that the Government would say makes

1    Mr. Silicani even more dangerous because if he has mental

2    health issues, we should lock him up forever.  You know, 40

3    years may not be enough as long as they're here predicting

4    behavior.  But what we do know is that Drew Silicani is a

5    volatile individual, has been a volatile individual.  And that

6    deserves a look.

7         Do you need 40 years to do that?  One of the

8    conditions, one of the circumstances under the statute, is the

9    need for mental health and other medical treatment.  Is the

10   sentence here going to provide enough time for that to give the

11   treatment?

12        A 40-year sentence is simply punitive.  Nobody makes

13   any argument to the contrary.  It is punitive.  So do we need

14   40 years in order to give Mr. Silicani sufficient attention

15   medically and mentally while he's incarcerated?  No.  240

16   months is plenty to do that.  If he's a danger, they can decide

17   it at some other point.  But you certainly can't decide it now.

18   And it is just plain wrong to say 40 years is justified in this

19   case.

20        And let me tell you why.  Because the Government also,

21   although they cite a single case, and maybe one that -- I think

22   one other case from a different circuit in their memorandum

23   with regard to the kind of playing field we're dealing with

24   here in terms of sentence, they're really kind of ignoring

25   that.  They're just addressing that because it has to be

1    addressed.

2            But they're ignoring the fact that even in this

3    district we've had previous murder-for-hire cases, one of which

4    resulted in a 7-year sentence and no state prosecution for any

5    other charges, fairly recently.  And the background and facts

6    of that case as cited in the memorandum, the background and the

7    facts of that are this, that the individual who was charged

8    with murder for hire or attempting a murder for hire wanted to

9    murder a peace officer who happened to have been her former

10   husband.

11           She was angry because this officer, Poteet, objected

12   to her having a known sex offender boyfriend in the home with

13   his child.  That was bad so she decided to hire somebody to

14   murder him.  Now, she didn't have a previous offense.  Had she

15   had, I suppose the Government might have asked for more.  I

16   don't know.  But she got a 7-year sentence.

17           There was another fellow who was out of our

18   office -- and I apologize.  I can't pull the name of the case

19   up, but Mr. Szott and Your Honor can check it if you like --

20   who was charged for murder with hire, planned to murder his

21   parents for insurance proceeds and as an adjunct to that plan

22   pushed his wife and young child off a cliff near Green River,

23   Wyoming.

24           In this court, not before Your Honor but in federal

25   court, on the murder for hire, on the murder plot, received a

1   sentence I believe of roughly 10 years.  He was subsequently

2   charged with and tried for the murder of his wife and child and

3   received a life sentence in that state case, but on the murder

4   case here -- on the attempted murder received a 10-year

5   sentence.

6          There are two actual murder cases where people killed

7   another human being, one in a drug offense that the sentence is

8   still pending, but agreed; and another where an Indian fellow

9   decided he didn't like what was being said to him so he killed

10  another individual on the reservation by beating him to death

11  with a rock.

12          These people who actually killed someone had received

13  and will be receiving sentences of 25 and 27 years,

14  respectively.

15          Another case that our office represented was a highway

16  patrolman, Joseph Rile.  He was accused of plotting the murder

17  of a Wal-Mart truck driver.  He was going to murder him and

18  collect the insurance proceeds.  That went awry.  He was

19  tried -- well, he wasn't tried.  He admitted, entered a plea of

20  guilty in this court and received a sentence of 14 years.

21          The differences aren't just slight.  The differences

22  are stark.  Those differences take into consideration the

23  history and characteristics of these defendants and in some

24  respect, in large respect, the offense itself.  It is very

25  difficult to say, given those facts -- and I don't -- I don't

1  believe that Mr. Silicani needs special treatment, but I do

2  think he needs and requires and deserves at least an equal look

3  at the facts and circumstances of his offense as compared to

4  the facts -- to the facts and circumstances of other offenses

5  in this and other courts that have resulted in sentences far,

6  far less than the 40 years recommended in this case.  It is

7  simply excessive.

8        Is 40 years sufficient, but not greater than

9  necessary, to punish this offense?  It is far greater than

10 necessary.  Is a low-end guideline sentence of 235, 240 months

11 sufficient, but not greater, to punish this offense?

12 Sufficient, I suppose it could be argued either way a few years

13 up and down, but I don't intend to do that and I don't propose

14 that to the Court in these particular circumstances.  But it

15 certainly fits within and in many cases above the sentences

16 being passed in this and other districts and other circuits for

17 this particular type of offense.

18       This offense has a lot of emotion.  I mean, we're

19 dealing with plots to kill parents; the disappointment and the

20 betrayal, the disgrace, all of those things that may be felt by

21 the threatened victims and by the Government on their behalf.

22       We all understand that.  We can all -- I don't know if

23 we can all feel it as directly as the -- as the parents do,

24 that disappointment, but that disappointment doesn't justify 40

25 years of a person's life and certainly not on the basis of one

1   or two offenses committed later in that person's life, and

2   certainly not in consideration of the facts that this

3   individual, while not excusing these acts -- and I'm not asking

4   for probation.  I'm not asking for 5 years and I'm not saying

5   10 years.  I'm not excusing this based on history.  He needs a

6   sufficient time in custody to deal with his mental issues, to

7   try and with help rehabilitate himself and to understand that.

8        But not so much that by the time he is rehabilitated

9   it's just warehousing; it's simply leaving him there.  And for

10  what purpose?  Because it makes everyone feel if not good, at

11  least satisfied that they have maxed out everything they

12  possibly can.

13       Mr. Szott's argued that this is a unique case.  As

14  I've demonstrated to the Court, there's nothing unique about

15  this.  This is a case with a different set of facts than the

16  ordinary drug cases, assault cases, murder cases, but there's

17  nothing unique about it.  This Court deals with these kinds of

18  cases, if not the specific cases, every day.

19       And, Your Honor, what the Government is asking is

20  excessive in the extreme.  It is far, far greater than

21  necessary to meet the purposes of sentencing.  You can't

22  just -- you have to look at all of those.  What the Government

23  suggests is that punitive sentence for as much as you can

24  possibly do.  Presumably if there were a life sentence involved

25  in this potentially, but not authorized by the guideline for

1    the zero to life, or even 10 to life, they would be saying give

2    him a life sentence because, well, you know, then we know for

3    sure.  Or they might even be generous and say don't give him a

4    life sentence, just give him a 50-year sentence so that he dies

5    in prison, so that he lives the rest of his life with animals,

6    in cages because that's the kind of punishment this offense

7    deserves.

8            It is not.  It deserves punishment.  It deserves

9    serious punishment.  But not the kind of punishment they

10   recommend.  And I would urge the Court to enter a sentence in

11   this matter within the guidelines in this case.  And, again,

12   what I have in mind now and what I've always had in mind is

13   that a 20-year, or 240-month, sentence was sufficient, but not

14   greater than necessary, in this case.  Thank you.

15           THE COURT:  Thank you.  Let's hear from the witnesses

16   who are -- have advised that they wish to make a statement.  I

17   believe the defendant's mother wishes to address the Court.  If

18   I'm wrong, though, please advise.

19           If you could state and spell your name, please.

20           MS. LAMBERT:  Cheryl K. Lambert, C-h-e-r-y-l

21   L-a-m-b-e-r-t.

22           THE COURT:  Welcome, Mrs. Lambert.

23           MS. LAMBERT:  Thank you.  Your Honor, today is the

24   saddest and most difficult day of my life as I can no longer

25   help my son, Andrew Silicani.  I love my son, but I am

1   devastated and sickened by his actions and desire for my death

2   and that of my husband John.  I was shocked when the FBI told

3   me that Andrew had attempted a contract of hire on my husband

4   and me.  Until that time, I had believed that Andrew and I had

5   a close, loving, mother-son relationship.

6           I've had many sleepless nights with feelings of grief,

7   remorse and fear.  I've had bouts of tears at happy events such

8   as my stepdaughter's graduation as I remember the happiness and

9   hope I had for Drew when he graduated.  I have sought

10  counseling for my distress from a psychiatrist.  My once low

11  blood pressure is now in the hypertensive range, and my family

12  physician believes this is due to the stress of this situation

13  and has placed me on medication.

14          Drew's actions have also impacted -- has had an impact

15  on my family and that of John's.  It is difficult for them to

16  understand Andrew's actions and our response.  They were also

17  fearful of his erratic behavior.  They have concerns for their

18  safety when visiting Cheyenne.  Friends have shied away as they

19  are horrified and do not know what to say or what to do.

20          Andrew had been in Cheyenne six weeks when he was

21  arrested, jailed and later sentenced to the Wyoming State

22  Penitentiary.

23          Both my husband, John, and I have concerns regarding

24  Drew's parole and release from prison.  I no longer felt that

25  at age 23 Drew would be able to accept the guidance and

1   structure that he needed in order to stay out of trouble, nor

2   did I feel confident that psychiatric assistance would be

3   helpful.  For, you see, Andrew has had psychiatric assistance

4   and the assistance of psychologists and behavioralists from the

5   time that he was 3, constantly in treatment, went to a -- we

6   ended up putting him in a private high school in Michigan which

7   would also help him with his behavior.

8          Generally both John and I are fearful of Andrew's

9   behavior.  I have amended my life insurance policy to exclude

10  Andrew, and he will not benefit from the proceeds of my estate

11  at all.

12         We have updated our security system in an effort to

13  find peace in our home.  John and I are fearful that Andrew

14  will be released during our lifetimes and will again make an

15  attempt on our lives.  We are fearful for John's

16  19-year-old-daughter, too.

17         My son, who I love, has the misfortune of a disorder

18  which interferes with his ability to function appropriately in

19  society.  I believe Andrew is dangerous.  It is my firm belief

20  that he needs to be confined in order to protect my family,

21  myself and others from his potentially harmful actions.

22         Andrew, you are my son and I love you forever.  I

23  forgive you, but that doesn't mean that I accept your behavior

24  or trust you.  I forgive you for me so I can let go and move

25  forward with my life.

1          Now my real grieving begins as I learn to let go of

2    you, my son, my only child.

3          Your Honor, no parent should fear for their lives at

4    the hands of their child whom they have loved, nurtured and

5    cared for.  Thank you.

6          THE COURT:  Thank you.

7          Mr. Lambert, I wasn't sure if you wished to make a

8    statement.

9          MR. OTT:  John Ott is my name, O-t-t.

10          THE COURT:  Oh, I'm sorry.

11          MR. OTT:  No, not at this time.

12          THE COURT:  All right.  Thank you.

13          CHERYL LAMBERT:  Thank you.

14          THE COURT:  Mr. Barrett, anything further before I

15    call on your client?

16          MR. BARRETT:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  Andrew, if you wish to make a

18    statement -- you're not required to, but if you wish to do so,

19    you're certainly invited forward.

20          THE DEFENDANT:  Thank you, Your Honor.  Your Honor, I

21    would greatly appreciate the opportunity right now to apologize

22    to my mother and stepfather.

23          I'm sorry, sorry for not just this but everything I

24    haven't done.  I haven't given you the respect, love and

25    appreciation you so greatly deserve.  I haven't been the son

1    you deserve as well.  You're the most extraordinary woman I

2    know and I love you very much.  I want you both to know -- even

3    if you don't believe me, I still want you to know that I have

4    no intentions of harming either one of you.  This was the

5    dumbest mistake I have ever made.  I don't want either one of

6    you to feel like you have to watch over your shoulder.  I love

7    you both very much even though it doesn't seem like it.  So I'm

8    sorry.

9              Your Honor, I made some bad choices in my life, not

10   many, but some worse than others.  I have a very lengthy mental

11   health history as well as a substance abuse problem.  My family

12   history hasn't been a walk in the park either.  Now I'm not

13   saying that any of these problems make this crime any less

14   serious, because that's definitely not the case, but it is

15   something to look at, I think.  I'm not perfect, none of us

16   are, and I'm not insinuating that anyone is trying to say that.

17   But I wasn't dealt a very good hand from the start anyways.

18   But there are a lot of people that haven't been -- that have

19   been dealt rough hands and made it in life.

20             Now, with that said, I believe that I have a chance,

21   chance to move forward and move ahead.  I made a promise to

22   myself that I'm done with this type of lifestyle.  I want

23   better for myself.  I finally feel confident that a better life

24   beyond crime and criminal thinking is possible.

25             There's a small amount of hope that is keeping me in

1    good faith.  You've gone over my PSI, so I'm sure you see that

2    I have had a lot of issues in my life.  The way my childhood

3    went, I had a lot of people saying I wasn't going to make it --

4    teachers, parents and friends.  To this day I still do.  At

5    this point in my life, this exact moment, I finally don't

6    believe them.

7          So with everything said and done, Your Honor, I ask

8    you one favor, and I know I'm in no position to be asking

9    anyone for favors.  But I ask you anyways, please allow me to

10   have the opportunity to have a final chance, one final chance,

11   to prove to everyone that said I wasn't going to make it -- to

12   my friends, to my family, and most importantly to myself --

13   that I can make it, that I can succeed and that I can make

14   something of myself.

15         Please allow me this opportunity.  I promise that you

16   will not regret it.  I know that whichever way you go I'm

17   looking at some time regardless.  I just hope that you see that

18   I'm sincere and that I'm willing to make the changes I need to

19   make.  So again, please, please allow me the chance to pull my

20   life around.  I promise you won't regret it.  Thank you very

21   much for your time and letting me explain my situation.

22         I also wanted to -- I also wanted to say to the

23   prosecution that I understand where you guys are coming from,

24   you know.  I don't -- I don't -- I couldn't begin to understand

25   how difficult your job is and, you know, where you guys are

1    having to come from.  So I definitely understand and I agree

2    this is a serious case and, you know, punishment should be

3    serious.  So I just -- I wanted to put that out there, that I'm

4    not -- I'm not -- I'm not holding any animosity or any kind

5    of -- basically just I'm not, you know, I mean, I -- I get it,

6    I understand, and I thank you for your time.

7            THE COURT:  Thank you, Mr. Silicani.

8            Well, in terms of the disposition of this case, this

9    is an unusual case.  Every case is different.  Mr. Barrett is

10   correct in that.  We have different offenders.  We have

11   different life histories.  Offenders come before the Court at

12   different ages.  They have different criminal histories.  They

13   have different uncharged conduct, different issues with

14   substance abuse and mental health.

15           This is an unusual case because before me is a young

16   man who has been a difficult person for nearly his entire life.

17   Rarely do we see anyone diagnosed at the age of 4 with a

18   disorder.  Mental health providers don't want to call it

19   antisocial at that age because it seems so resistant to change,

20   but that's essentially the oppositional defiant disorder in

21   looser terms, or perhaps more hopeful or aspirational terms,

22   and that is what makes this case quite tragic.  To have a young

23   man go through his youth with such oppositional and violent

24   tendencies is very stark.

25           To read about a young man who in 4th grade had a

1   meltdown in school and kicked his teacher in the head is not

2   something I've ever read.  And yet your parents continued to

3   work with you with therapy throughout this entire period with

4   limited success.  And now we have a young man who on paper

5   appears to be the most -- to have the most troubling diagnosis

6   or symptoms suggesting a very disordered personality.  We don't

7   have the benefit of a recent diagnosis, but we have a -- we

8   have someone who makes the choice to -- that violence is the

9   answer for matters that are really even apparently unprovoked.

10          The two stabbings within ten days in January of 2011

11   are chilling by themselves.  One was never prosecuted, for

12   whatever reason.  And to have -- have the stabbing that landed

13   you in prison, even with an opportunity to have a different

14   outcome through boot camp, that failed, and you ended up in

15   prison.  That stabbing was -- really indicated the -- this

16   continuing picture of callous disregard where you stabbed

17   someone so much, hoping to leave them dead, for no clear reason

18   other than perhaps greed and a proclivity towards violence.

19          In short, to see someone as young as you with such an

20   exceptionally callous, greedy, criminal-thinking personality is

21   troubling.  And while I appreciate and -- your statements, the

22   history suggests that whatever disorder that you're struggling

23   with, that history suggests that the words ring hollow.

24          You've essentially squandered your life, the

25   opportunities in therapy and now at 23 to take steps to commit

1  or to -- to commit a crime that has such chilling elements is

2  very troubling.

3          Your mother, who stood by you through the entire

4  course of your life, has poured resources into making you the

5  son that she wanted you to be and that you deserved to be, to

6  have this be the outcome is heartbreaking.  She not only poured

7  resources in terms of mental health resources, but even while

8  you were in prison sent money and gifts, purchased items for

9  you on demand.  And to have this be the mindset that you come

10  away with to plan such a heinous offense, really with no

11  apparent interest in anything other than the greed and

12  receiving money.  For what?  For a new car?  For ten tattoos

13  and drugs?

14          To exchange a life for such juvenile desires is hard

15  to comprehend.  And to then express that you really don't care

16  if there's suffering involved is even harder to comprehend.

17  And to make matters worse, as though they could be worse, to

18  talk about taking a similar action against your father, who I

19  understand you've had issues with, but apparently he wasn't

20  first on your list because you didn't know whether he had any

21  resources that would ever come your way.  I'm not sure.  This

22  to me is impossible, impossible to understand.

23          So, considering the callous disregard that you've held

24  toward other people for -- for such a long time, the potential

25  continuing danger that you present to society, with disordered

1    ways of thinking that are very difficult to change and an

2    approach that appears to lack explanation other than, again, a

3    callous disregard for not just life but for those people that

4    care and love you as you stand here today, and greed is -- are

5    factors that elevate this case beyond just a desire for

6    punishment.

7         I don't sit up here desiring to punish anyone.  But

8    you with the -- with your mindset and your nature, your past

9    history, the particular chilling nature of the offense warrants

10   an upward variance, and I'll vary upward four levels and

11   sentence you to 420 months.

12        For the reasons given I will state sentence as

13   follows:  Pursuant to the Sentencing Reform Act of 1984 and

14   those factors set forth in 18 USC Section 3553(a), it is the

15   judgment and sentence of the Court that the Defendant Andrew

16   Lambert Silicani is hereby sentenced to a term of 120 months

17   for Count 1, 120 months as to Count 2, 120 months as to Count 3

18   and 60 months as to Count 4, for a total of 420 months,

19   inasmuch as each count is to be served consecutive to one

20   another in the custody of the Bureau of Prisons.

21        Upon release from custody, the defendant shall be

22   placed on supervised release for three years as to counts 1, 2,

23   3 and 4, all counts to be served concurrently.

24        Within 72 hours of release from custody, the defendant

25   shall be -- report in person to the probation office in the

1    district to which he's released.

2           While on supervised release, the defendant shall

3    comply with the mandatory and standard conditions of

4    supervision adopted by this court.

5           In addition, due to the defendant's documented history

6    of substance abuse and mental health issues, special conditions

7    are added to require participation in treatment, testing and

8    absence -- abstinence from mind-altering substances, including

9    alcohol as well as mental health treatment.

10          The following special conditions are imposed.  The

11   defendant shall participate in and successfully complete

12   substance abuse treatment in a program approved by the

13   probation office and abide by the rules, requirements and

14   conditions of the treatment program.  The defendant shall not

15   discontinue treatment without permission of the probation

16   office.

17          The defendant shall submit to drug and alcohol testing

18   as directed by the U.S. Probation Officer and comply with

19   specific copays imposed pursuant to district policy for failure

20   to comply with drug testing.

21          The defendant shall participate in mental health

22   treatment at a program approved by the U.S. Probation Officer

23   and abide by the rules, requirements and conditions of the

24   treatment program, including proper direction at taking

25   prescribed medications.  The defendant shall not discontinue

1    treatment without the permission of the U.S. Probation Officer.

2           As a component of the defendant's treatment and

3    testing program, the defendant shall pay a one-time fee of $250

4    to partially defray the costs of treatment and/or drug testing.

5    Monetary payments made by the defendant shall be applied to

6    this fee only after all other court-ordered monetary

7    obligations are fulfilled.  Payment of the fee shall be by

8    money order or cashier's check, payable to the Clerk of the

9    District Court at the address shown on the payment coupon.

10   This condition is waived if the defendant is supervised by a

11   district other than Wyoming.

12          The defendant shall refrain from any use or possession

13   of alcohol and other intoxicants, including over-the-counter

14   medications used contrary to the recommended dosage or the

15   intentional inhalation of any substance, prescribed or

16   otherwise, without the permission of the U.S. Probation

17   Officer.

18          Additionally, the defendant shall not enter

19   establishments whose primary income is derived from the sale of

20   alcohol.

21          The defendant shall submit his person, residence,

22   storage facility, office or vehicle to a search conducted by a

23   U.S. Probation Officer at a reasonable time and in a reasonable

24   manner upon reasonable suspicion of contraband or evidence of a

25   violation of these conditions.  Failure to submit to a search

DOCKET NO. 15-CR-057-F        JUDGMENT & SENTENCE

1    may be grounds for revocation, and the defendant should warn

2    all other occupants that the premises may be searched pursuant

3    to this condition.

4          The defendant shall participate in a cognitive

5    behavioral treatment regimen which may include, but is not

6    limited to, moral reconation therapy, cognitive thinking,

7    Thinking For A Change or interactive journalling.  The

8    defendant shall actively participate in treatment until

9    successfully discharged or until the U.S. Probation Officer has

10   excused the defendant from the treatment regimen.

11         The defendant shall have no contact with the victims,

12   Cheryl Lambert and John Ott, nor any contact with James

13   Silicani or any step-siblings or other step-parents unless

14   initiated by the listed individuals.

15         The Court finds that community restitution is not

16   authorized in this case.

17         The Court finds the defendant does not have the

18   ability to pay a fine in addition to the restitution previously

19   ordered in Laramie County District Court.  That restitution

20   amount, for this record, is $15,196.67.  Therefore, a fine is

21   waived.

22         It is ordered the defendant shall pay a special

23   assessment of $100 per count for a total of $400 which shall be

24   due immediately.  Payments for monetary obligations shall be

25   made payable by the Clerk of the District Court, 2120

DOCKET NO. 15-CR-057-F        JUDGMENT & SENTENCE

1   Capitol -- to the Clerk of the District Court by cashier's

2   check or money order.  That address is 2120 Capitol Avenue,

3   Second Floor, Cheyenne, Wyoming, 82001.

4          The defendant shall participate in the Inmate

5   Financial Responsibility Program to pay his financial

6   obligations.  The defendant shall pay all financial obligations

7   immediately.  Any amount not paid immediately shall be paid

8   through the Inmate Financial Responsibility Program in

9   quarterly installments of not less than $25 per quarter.

10         Any amount not paid immediately or through the Inmate

11  Financial Responsibility Program shall be paid commencing 60

12  days after the defendant's release from custody in monthly

13  payments of not less than $25 or 10 percent of the defendant's

14  gross monthly income, whichever is greater.

15         All monetary payments shall be satisfied no later than

16  60 days prior to the expiration of the defendant's term of

17  supervision.

18         The Court recommends the defendant participate in the

19  Residential Drug Abuse Program.

20         The defendant has not waived his right to appeal.  As

21  there's no plea agreement in this case, the defendant is

22  reminded that he has only 14 days from the date of entry of

23  judgment to file any Notice of Appeal.

24         Other than reasons previously argued, is there any

25  reason why the sentence should not be imposed as stated?  Mr.

1    Barrett.

2            MR. BARRETT:  No, Your Honor.

3            THE COURT:  For the Government, Mr. Szott.

4            MR. SZOTT:  Your Honor, I know the Court stated that

5    the sentence on the various counts should be served

6    consecutively to reach 420 months.  He -- Mr. Silicani is

7    currently serving a sentence in state prison and the United

8    States would ask that the sentence in this case be imposed

9    consecutive to the undischarged state sentence if for no other

10   reason that he was in prison at the time he committed this

11   offense, so a consecutive sentence seems appropriate, Judge.

12   And I'm not sure how much of that time will be left and whether

13   he would be shortly paroled to his federal time, but the

14   Government would ask for a consecutive sentence.

15           THE COURT:  Yes, there's no reason to run this

16   sentence concurrent with the sentence that's undischarged in --

17   let me get that docket number -- in Docket 30-869, and so this

18   sentence shall be served consecutive to the sentence imposed by

19   Laramie County District Court in Docket 30-869.

20           Any other corrections or additions?

21           MR. SZOTT:  No, Your Honor.  Thank you.

22           THE COURT:  Good luck to you, Drew.

23           THE DEFENDANT:  Yeah.

24           THE COURT:  We will stand in recess until call.

25       (Proceedings concluded 10:25 a.m., July 9, 2015.)

1                    C E R T I F I C A T E

2

3

4

5            I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14           Dated this 10th day of August, 2015.

15

16

17

18                        /s/ Janet Davis

19          _____

20                      JANET DAVIS
                  Registered Diplomate Reporter
21          Federal Certified Realtime Reporter
                  United States Court Reporter
22

23

24

25